In re CLASSIC COACH INTERIORS, INC., Debtor.

Marquette Bank Illinois, Plaintiff,

v.

Charles E. Covey, Chapter 7 Trustee for Classic Coach Interiors, Inc., Defendant.

Bankruptcy No. 01–80431.
Adversary No. 01–8202.

United States Bankruptcy Court, C.D. Illinois.

Sept. 23, 2002.

Dale G. Haake, Rock Island, IL, for Debtor.

Andrew W. Covey, Gregg N. Grimsley, Peoria, IL, for Charles E. Covey, trustee.

## OPINION

THOMAS L. PERKINS, Bankruptcy Judge.

This adversary proceeding commenced when Farmers & Mechanics Bank, f/k/a Marquette Bank Illinois ("BANK") filed its Complaint for a declaratory judgment that it holds a valid security interest in dividends unlawfully paid by the Debtor and in the proceeds of the Chapter 7 Trustee's actions to recover the dividends from the shareholders. This matter is before the Court on the Motion for Summary Judgment filed by the BANK. The motion is opposed by Charles E. Covey, Chapter 7 Trustee for Classic Coach Interiors, Inc., ("TRUSTEE"). The parties have stipulated to certain facts.

## BACKGROUND

The Debtor, Classic Coach Interiors, Inc., ("CLASSIC COACH"), a closely held Illinois corporation, was in the business of providing custom vehicle conversions and installations of adaptive equipment for disabled drivers. In 1990 or 1991, in order to raise capital, CLASSIC COACH began to sell preferred stock to private investors. The preferred shares gave the investors no voting rights, but promised a healthy annual dividend.[1] Beginning with four (4) individuals in 1991, the class of preferred stockholders increased to nineteen (19) in 1999. The total amount of dividends de-

---

1. The stock certificate of one investor, Walter DeDecker, attached to his proof of claim, provides that the stockholder is entitled to receive cumulative cash dividends, when and if declared by the Board of Directors, out of surplus or net profits of the corporation at the rate of eleven percent (11%) per annum.

clared for the benefit of preferred stockholders grew from $20,383.34 in 1991 to $118,877.55 in 1999. From 1991 through 1999, total dividends were declared in the amount of $684,000.00, of which only $284,000.00 were actually paid out to the preferred shareholders, with the remaining $400,000.00 being "reinvested."

Under pressure from its lenders, CLASSIC COACH filed a voluntary petition for protection under Chapter 11 on February 2, 2001. Having ceased doing business just prior to the bankruptcy filing, it was never able to reopen its doors and converted to Chapter 7 on May 4, 2001. Shortly after conversion, the TRUSTEE retained an attorney to investigate and recover avoidable prepetition transfers.

The TRUSTEE filed adversary complaints against each of the preferred shareholders alleging that the dividends that they received were paid while CLASSIC COACH was insolvent, that the dividends were, therefore, unlawful under Section 9.10 of the Illinois Business Corporation Act,[2] and that the dividend payments are avoidable and recoverable by the TRUSTEE pursuant to Section 544(b)(1) of the Bankruptcy Code.[3] The BANK contends that its prepetition security interest encompasses any monies that the TRUSTEE is able to recover from the preferred shareholders.

The BANK'S Commercial Security Agreement with CLASSIC COACH, dated June 10, 1997, securing a note of the same date in the principal amount of $275,000.00, identifies the BANK'S collateral as follows:

> All equipment of the Debtor of every description, whether now or hereafter existing or acquired; all accessories, or equipment now or hereafter affixed thereto or used in connection therewith; all inventory of every description whether now or hereafter existing or acquired; all accounts and contract rights evidencing any obligation to Debtor for payment for goods sold or leased or services rendered whether now or hereafter existing or acquired; general intangibles of the Debtor, whether now or hereafter existing or acquired; and all proceeds for the sale, liquidation, or disposition of any of the foregoing items.

The BANK properly perfected its security interest by filing a financing statement. Arguing in the alternative, the BANK contends, first, that the unlawfully paid dividends are either general intangibles or accounts, subject to its security interest, and second, that the BANK, as a creditor, holds an independent cause of action for recovery of the dividends that the TRUSTEE is now asserting pursuant to Section

---

**2.** That provision states, in material part, that "no distribution may be made if, after giving it effect: (1) the corporation would be insolvent; or (2) the net assets of the corporation would be less than zero or less than the maximum amount payable at the time of distribution to shareholders having preferential rights in liquidation if the corporation were then to be liquidated." 805 ILCS 5/9.10(c).

**3.** To date, fifteen (15) of the nineteen (19) preferred shareholders have settled the TRUSTEE'S claims against them. The remaining four (4) preferred shareholders are disputing the TRUSTEE'S claims. Today's decision makes no determination of the validi-

ty or invalidity of the TRUSTEE'S claims against the four (4) remaining preferred shareholders or the validity or invalidity of the defenses raised by the shareholders. For example, the BANK and the TRUSTEE have stipulated that CLASSIC COACH was at all times insolvent and that the dividends were, therefore, unlawful under 805 ILCS 5/9.10(c). The record is devoid of any evidentiary support for that contention, which the Defendants in the remaining adversaries dispute, and the Court makes no determination of that issue, but merely accepts it as true for the purpose of the BANK'S motion.

544(b)(1) and that any recovery made by the TRUSTEE must be paid to the BANK to the exclusion of general unsecured creditors. In response, the TRUSTEE argues that the BANK'S security interest terminated as of the petition date, that the right of recovery asserted by the TRUSTEE arose postpetition and, therefore, is not subject to the BANK'S prepetition security interest, and that any funds recovered by the TRUSTEE are for the benefit of unsecured creditors.

## ANALYSIS

Under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to show that there is no factual dispute. *Id.* at 322, 106 S.Ct. 2548. Inferences to be drawn from underlying facts must be viewed in the light most favorable to parties opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material factual dispute is sufficient to prevent summary judgment only when the disputed fact is determinative of the outcome under applicable law. *Id.* at 248, 106 S.Ct. 2505.

### A. Are the Dividends the BANK'S Collateral?

The BANK'S position that the paid dividends are general intangibles or accounts that are its collateral rests entirely upon the scope of its security interest, which is dictated not only by the language of the security agreement itself but, also, and more importantly in this case, the nature and extent of CLASSIC COACH'S interest in the property at issue. It is axiomatic that a party granting a security interest has the power to do so only with respect to property in which it has an interest and then, only to the extent of its interest. *See, Gilmore, Security Interests in Personal Property* § 11.5 (1965). A security interest is not enforceable and does not attach unless, among other things, the debtor has rights in the collateral. 810 ILCS 5/9–203(1).[4] The nature and extent of property rights are determined by state law. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The debtor must have an interest in the property as of its bankruptcy filing; if the collateral was spent or dissipated, the lender cannot have a secured claim as to that property. *In re Pitcock,* 208 B.R. 862 (Bankr.N.D.Tex.1997).

The terms "account" and "general intangibles" are defined in UCC § 9–102 as follows:

> **§ 9–102. Definitions: "account"; "general intangibles"**
>
> "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel pa-

---

**4.** All references and citations to Article 9 of the Uniform Commercial Code—Secured Transactions, are to the statute that was in effect on February 2, 2001, the date of CLASSIC COACH'S bankruptcy filing. Wholesale amendments to Article 9 became effective in Illinois as of July 1, 2001. The statute in effect on the petition date applies to this matter.

per, documents, instruments, investment property, rights to proceeds of written letters of credit, deposit accounts, uncertificated certificates of deposit, and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts.

By the terms of its June 10, 1997, Commercial Security Agreement, the BANK took a security interest in CLASSIC COACH'S present and after acquired accounts and general intangibles, and the proceeds therefrom. An "account" is the ordinary commercial account receivable and "general intangibles" refers to miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security and excludes money. *Marquette Nat. Bank v. B.J. Dodge Fiat, Inc.,* 131 Ill.App.3d 356, 475 N.E.2d 1057, 86 Ill.Dec. 678 (2 Dist.1985).

Contrary to the BANK'S contention, however, this matter does not turn on whether dividends fall within the category of general intangibles or accounts. Because the dividends at issue here were declared by, not payable to, CLASSIC COACH, the threshold question is whether CLASSIC COACH retained any property interest in the dividends that it paid to its preferred shareholders.

 Since the BANK'S security interest is dependent upon the nature of CLASSIC COACH'S property interest, the first step is to define the metaphysical relationship between CLASSIC COACH,

the corporation, and the preferred stock dividends that it declared and paid.[5] A dividend does not exist, of course, until the board of directors declares it. Once declared, but yet unpaid, the dividend constitutes a liability of the corporation. By no means is a declared but unpaid dividend an asset of the corporation, although it is an asset of the shareholders to whom it is owed. *Ford v. Ford Mfg. Co.,* 222 Ill.App. 76, 1921 WL 992 (1 Dist.1921). It follows that a declaration of a dividend does not give rise to a property interest of the corporation. From an accounting perspective, the liability created by declaration of the dividend is not offset by a corresponding increase in the asset side of the ledger and, thus, the corporation's net worth declines upon declaration. (Hence, the reason for 805 ILCS 5/9.10(c).)

 It is true that when the dividend is paid by the corporation, the liability to the shareholders is satisfied and eliminated. But the corporation's cash is used to pay the dividend, thereby correspondingly depleting an asset. So, while declaration of the dividend has a negative effect on the corporation's net worth, payment of the dividend, like payment of any other debt, is net worth neutral. And the corporation no more retains a property interest in the funds used to pay dividends than it does in funds used to pay its trade creditors or any other liability. Although the BANK contends that the dividends were paid unlawfully, and that *it,* as a creditor, has a claim to recover those payments, the BANK does not contend that the *corporation* has any continuing property interest in the cash used to pay the dividends.[6]

---

5. *See, Gilmore, Security Interests in Personal Property* § 12.9, at p. 395 (1965) (whether property does or does not have a present existence, simple enough in the case of chattels, can "become obscure under the least metaphysical approach in the case of intangibles").

6. In its brief, the BANK focuses entirely on the *use* of the funds to pay dividends, arguing that the "dividends" remain the corporations's general intangibles or accounts. The BANK overlooks or ignores the nature of the tangible property, the *res corporales,* that was actually transferred, which was money. Of

Perhaps the fallacy of the BANK'S position is best exposed by considering what the BANK, in its brief, doesn't say, as much as what it does. By arguing that CLASSIC COACH retains an interest in the dividends paid out to preferred shareholders from 1991 through 1999, the BANK, without saying as much, implies that the dividends, which were paid out in cash, are sitting out there squirreled away under the mattresses of the preferred shareholders, and that these monies constitute an identifiable, traceable fund in which CLASSIC COACH retains a property interest and in which the BANK holds a security interest. This is not only contrary to logic but, more importantly, unsupported by any evidentiary basis whatsoever. The cash dividends, once paid and commingled with other funds and/or spent, have long since ceased to exist as an identifiable *res*. Here, the metaphysical nonexistence of an identifiable property interest in the dividends is, in one sense, an immutable truth, entirely independent of the lawfulness or unlawfulness of the payment.

In its brief, the BANK admits finding no reported opinion holding that a corporation's dividends are its own general intangible or account.[7] The cases relied on by the BANK are inapposite. Holding that an uncertificated security owned by the debtor was a general intangible, the court in *In re Turley*, 172 F.3d 671 (9th Cir. 1999) did not have occasion to address the theoretical retention of a property interest in an unlawfully paid dividend. Neither did the court in *In re Pearson Industries,*

*Inc.*, 152 B.R. 546 (Bankr.C.D.Ill.1993), holding that the debtor's prepetition payment to a bank to redeem shares of its preferred stock was avoidable by the Chapter 7 trustee because it was not authorized by the board of directors as required by Illinois law and was in violation of the corporation's previously confirmed Chapter 11 plan of reorganization. Whether a prepetition transfer is avoidable by a trustee in bankruptcy, however, is an altogether different question from whether a corporation that distributes dividends while insolvent retains any property interest in the paid dividends that would subject those funds to the lien of its secured creditor in general intangibles.

This Court holds that CLASSIC COACH never had a property interest in the dividends that it became liable to pay, once declared, and that the cash used to pay the dividends, once paid, ceased to be property of CLASSIC COACH. The BANK'S claim of a security interest in the dividends, wholly dependent upon a property interest existing as of the petition date, must fail.[8]

**B. Does the BANK have a personal claim to the TRUSTEE'S recovery?**

Alternatively, the BANK contends that, since the preferred dividends were unlawfully paid while CLASSIC COACH was insolvent, that it, as a creditor of CLASSIC COACH, had a prepetition right, under state law, to avoid and recover some or all of the unlawfully paid dividends, that this private right of action was not divested by the bankruptcy filing, and that the

---

course, money is neither a general intangible nor an account.

**7.** Since the concept of taking a security interest in a debtor's liabilities is nonsensical, it is little wonder that there are no reported decisions that categorize dividends under Article 9.

**8.** Because CLASSIC COACH lacks a property interest in the paid-out dividends, it is not necessary to consider the BANK'S arguments that the dividends are properly classified as general intangibles or accounts.

TRUSTEE acquired his bankruptcy right to avoid the unlawfully paid dividends subject to the BANK'S preexisting state law avoidance rights.[9] Admitting that it took no action to avoid or recover the dividend payments pre-bankruptcy, the BANK stresses that it has preserved that right, post-bankruptcy, by asserting it in several pleadings filed in the bankruptcy case and in communications with the TRUSTEE. The TRUSTEE counters by pointing out that since his avoiding power under Section 544(b)(1) depends upon an actual creditor's ability to avoid a transfer under Illinois law, that the avoiding power would be meaningless to the estate if it were exercisable only for that creditor's benefit.

Swimming upstream against a swift current, the BANK argues for an exception to the general rule that a trustee's avoidance powers are exercised for the benefit of the estate and that unsecured, non-priority creditors share ratably in estate assets. The exception asserted by the BANK would apply to actions brought by a trustee under Section 544(b)(1) to avoid a fraudulent transfer, where the trustee is relying on state law that gives creditors the right to avoid and recover, outside of bankruptcy, the same transfer for that individual creditor's benefit, and where the creditor has not waived its claim or otherwise slept on its rights. Under these circumstances, says the BANK, the creditor, in effect, has a lien on any proceeds that the TRUSTEE recovers, that gives it priority over the general unsecured creditors.

The general rule to which the BANK takes exception has deep roots in bankruptcy jurisprudence, beginning with *First National Bank of Baltimore v. Staake*, 202 U.S. 141, 26 S.Ct. 580, 50 L.Ed. 967 (1906), a case construing Section 67 of the then recently enacted Bankruptcy Act of 1898 ("Act"). There, certain creditors of the bankrupt had obtained liens, by levy of writs of attachment, against real property that the bankrupt had sold, but for which the deed had not been recorded. Because the attachment liens were obtained within four months of bankruptcy, they were avoided under Section 67 of the Act. Rejecting the argument of the attaching creditors that the trustee first pay the value of the property to them to the extent of their avoided liens, the Supreme Court held that the avoided liens are preserved for the benefit of the entire body of creditors, not just for the lienholders. Writing for the unanimous court, Justice Brown reasoned as follows:

> It is true that the attaching creditors are thereby deprived of the fruits of their diligence, but the same thing would have happened had the attachment been levied upon property to which the bankrupt had the whole and undisputed title, or of which he had made a fraudulent conveyance. As remarked by the district judge, "In cases where the bankrupt makes a valid conveyance, or where his fraudulent vendee makes a valid conveyance, the purpose of the law is worked out by preserving and enforcing the liens of the attaching creditors for the pro rata benefit of all the creditors."

202 U.S. at 148, 26 S.Ct. 580. Justice Brown concluded the opinion as follows:

> If the interest of (the bankrupt) in this property were sold solely for the benefit of the attaching creditors, it

---

9. The BANK claims that it has a private right of action for recovery of unlawfully paid dividends under both the Illinois Business Corporation Act of 1983 and the Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* It is not necessary for purposes of this decision, for the Court to determine whether such a private right of action exists or would be successful, under either statute. For the purpose of deciding the motion, the Court assumes the BANK has such rights.

would obviously result in a preference to those creditors over the general creditors of his estate, and in fraud of the bankruptcy act, which is designed to secure equality among all creditors.

202 U.S. at 149, 26 S.Ct. 580.

The Supreme Court had occasion, nine years later, to revisit the issue of the extent to which the policy of equality of distribution among all creditors underpins the bankruptcy laws in *Globe Bank & Trust Co. of Paducah, Kentucky v. Martin,* 236 U.S. 288, 35 S.Ct. 377, 59 L.Ed. 583 (1915). Two years before bankruptcy, the bankrupt fraudulently conveyed real property to his son, while indebted to three banks. Within four months prior to bankruptcy, the banks filed suit to set aside the fraudulent conveyance and levied writs of attachment upon the property. After the trustee avoided the fraudulent conveyance and sold the property, the banks claimed a superior interest in the proceeds, relying not only on their avoidable attachment liens but also on their inchoate right to avoid the transfer under state law that accrued at the time of the transfer, which, under state law, gave them priority over subsequent creditors not existing at the time of the transfer. Holding that the proceeds were properly distributed under the Act for the benefit of all creditors of the estate, the court rejected the banks' argument that the preexisting right of action to set aside the conveyance, gave the banks any special priority to the proceeds where the banks did not hold an unavoidable, prepetition lien against the property.

That rule of law was further refined in the venerable opinion written by Justice Oliver Wendell Holmes in *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), summarized in *Collier on Bankruptcy,* as follows:

Prior to the enactment of the Bankruptcy Code of 1978, the decision in *Moore v. Bay,* written by Justice Oliver Wendell Holmes, Jr., was one of the most controversial in the entire field of bankruptcy law. Interpreting section 70e of the former Bankruptcy Act, the predecessor to section 544(b), the decision allowed the trustee to avoid a transfer entirely without regard to the size of the claim of the creditor whose rights and powers the trustee was asserting, with the recovery to be retained for the benefit of the entire estate. Accordingly, under *Moore v. Bay,* the right of the trustee to recover is dependent upon just one creditor with a cause of action and not dependent at all upon the size of that creditor's claim against the debtor. In other words, an entire transfer can be set aside even though the creditor's claim is nominal and, moreover, the recovery of the trustee is for the benefit of all creditors including those who had no right to avoid the transfer. (Footnote omitted).

5 *Collier on Bankruptcy* ¶ 544.09[5](15th Ed.Rev.2001).

██ It is now well established under the Bankruptcy Code, that transfers avoided by the trustee using his strong arm powers, including Section 544(b)(1), accrue to the benefit of all unsecured creditors, not just those actual creditors upon whose state law voiding rights the trustee relied. *In re Cybergenics Corp.,* 226 F.3d 237, 243 (3rd Cir.2000); *Matter of Leonard,* 125 F.3d 543, 544 (7th Cir.1997) (rejecting creditors' contention that they won the prepetition race to the courthouse by filing a fraudulent transfer suit and recording a *lis pendens* notice, and that they thereby acquired an equitable lien against the transferred property, holding that those creditors were general unsecured creditors entitled to share in the proceeds of the

avoided transfer ratably with, not ahead of, other unsecureds); *In re Mortgageamerica Corp.*, 714 F.2d 1266, 1275–76 (5th Cir.1983).

■ Although not relied upon by the BANK, there is a narrow distinction of a trustee's ability to assert the rights of a creditor under Section 544(b)(1), for the benefit of the estate, recognized by the 7th Circuit:

> [A bankruptcy] trustee has no standing to bring *personal* claims of creditors. A cause of action is "personal" if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors. If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim. *See 3A Fletcher Cyc. Corp.* §§ 1134, 1277.1 (rev.perm. ed.1986).

> \* \* \* \* \* \*

> The equally valid mirror-image principle is that a single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner. (Citations omitted).

*Koch Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1348–49 (7th Cir.1987). The injury alleged, unlawfully paid dividends, is not personal to the BANK. The cause of action for recovery of the payments could have been brought by any creditor outside of bankruptcy and now, post-bankruptcy, may only be brought by the TRUSTEE as a represen-

tative of all creditors for the benefit of all creditors.[10]

■ In his brief, the TRUSTEE correctly points out that, if the BANK'S position was adopted, the avoiding power under Section 544(b)(1) would be rendered meaningless since that power derives wholly from the voiding rights that an actual unsecured creditor possesses under nonbankruptcy law. It matters not how loud or how often the BANK asserted its claim post-bankruptcy. The TRUSTEE'S avoiding powers are fixed as of the petition date and cannot be usurped or divested through any subsequent creditor conduct.

The BANK also relies on a short line of authority holding that where a trustee recovers property transferred preferentially that was subject to an unavoidable security interest enforceable against the transferee, the security interest remains enforceable against the recovered property or its proceeds in the hands of the trustee. *In re Ellingsen MacLean Oil Co., Inc.*, 98 B.R. 284 (Bankr.W.D.Mich.1989); *In re Figearo*, 79 B.R. 914 (Bankr.D.Nev.1987). For the reasons stated earlier in this Opinion, however, the BANK does not have an enforceable security interest or lien in the dividends declared and paid by CLASSIC COACH and those cases are of no moment.

All of the pertinent opinions, including those from the 7th Circuit, are contrary to the BANK'S position. The long history of cases applying the fundamental bankruptcy policy of equality of distribution among creditors reflects a consistent rejection of creditors' arguments for creation of the exception to that policy asserted by the BANK. The Court holds that the BANK has failed to establish that it is entitled to

---

**10.** The BANK asserts no unique standing to avoid the dividend payments under either the Illinois Business Corporation Act of 1983 or the Uniform Fraudulent Transfer Act.

judgment as a matter of law. Accordingly, its motion must be denied.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.